## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA

**CASE NO.**  6:09 CV 1833-ORL-28GJK

|  |  |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) |
| **J. BENNETT GROCOCK** | ) ) |
| **Defendant.** | ) ) ) |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      This case has its roots in a fraud perpetrated by CyberKey Solutions, Inc. ("CyberKey" or "the company"), a St. George, Utah company that once sold flash memory drives and other electronic devices, and its chief executive officer, Jim Plant ("Plant"). Starting in November 2005 and continuing through March 19, 2007, CyberKey and Plant engaged in (1) an elaborate scheme to publicize a fictitious $25 million purchase order from the U.S. Department of Homeland Security ("DHS") to attract interest in CyberKey, and (2) an ongoing unregistered public offering of the company's shares. In connection with this scheme, Plant was sued by the Commission and indicted in the U.S. District Court for the Eastern District of Pennsylvania on charges of securities fraud and obstruction of justice, among other things. The court sentenced

SCANNED

Plant to 97 months imprisonment in March 2009.

2.      This matter involves the sales of CyberKey securities by J. Bennett Grocock, ("Grocock") a securities lawyer from Orlando, Florida.  Grocock represented CyberKey as the company's counsel throughout the period it engaged in fraud, and was generally compensated with shares in the company.

3.      Between February 2006 and March 2007, Grocock sold millions of CyberKey shares, generating proceeds of approximately $250,000.  None of the shares Grocock sold were issued pursuant to a registration statement or any legitimate exemption from registration.

4.      As part of his representation of CyberKey, Grocock came to learn of two sets of material, non-public information about the company.  First, Grocock became aware in mid-to-late 2006 of three separate investigations, including two governmental investigations, into CyberKey's claims regarding DHS and the company's status as a publicly traded company.  Second, on March 7, 2007, in his role as CyberKey's attorney, Grocock attended the administrative testimony of Plant before the Commission's staff. During that testimony, the Commission's staff confronted Plant with documents that contradicted CyberKey's claim that it had a $25 million purchase order from DHS and demonstrated that CyberKey had not received any revenue from business transactions with DHS.  CyberKey's investors were not aware of either the investigations or the administrative testimony.

5.      In disregard of his fiduciary duty to CyberKey and its investors as the company's outside counsel, Grocock sold CyberKey shares worth over $170,000 after learning of these two sets of material, nonpublic information.

6.     Grocock avoided substantial losses by selling the CyberKey shares when he did, without going through the securities registration process and before this critical information was made public. As a result of his unlawful conduct, Grocock unjustly enriched himself by approximately $248,000.

7.     By virtue of his conduct, Grocock violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder. Unless enjoined Grocock is likely to commit such violations again in the future.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Grocock, directly or indirectly, made use of the means or instrumentalities of interstate commerce or the mails in connection with the conduct alleged in this Complaint.

9.     Grocock's residence and his principal place of business are in Orlando, Florida. Therefore, venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

## DEFENDANT

10.     Defendant J. Bennett Grocock, age 51, is a securities lawyer who lives in Orlando, Florida.

## RELATED ENTITIES AND PEOPLE

11.     CyberKey Solutions, Inc. is a St. George, Utah-based company that once sold flash memory drives and other electronic devices. CyberKey's common stock never

traded on a national exchange, but instead traded on the "Pink Sheets" electronic quotation system under the symbol "CYKC" and later "CKYS".

12.    Throughout the entire period relevant to this Complaint, Jim Plant was CyberKey's chief executive officer.

13.    Nancy Munro was Grocock's administrative assistant throughout the entire period relevant to this Complaint.

14.    Throughout the entire period relevant to this Complaint, J. Bennett Grocock, P.A., d/b/a the Business Law Group, was Grocock's sole proprietorship law firm in Orlando.  Grocock controlled and was the sole director, officer and principal of J. Bennett Grocock, P.A.

15.    Big Apple Consulting USA, Inc. ("Big Apple") was CyberKey's investor relations firm throughout the entire period relevant to this Complaint.

## FACTUAL ALLEGATIONS

16.    In June 2005, Grocock began serving as the escrow agent for a consulting agreement between CyberKey and Big Apple.

17.    After receiving a recommendation from a Big Apple executive, CyberKey retained Grocock as its outside counsel in November 2005.  The terms of Grocock's engagement contemplated that he would be paid $10,000 per month, either in cash or in "free trading shares" of CyberKey.  If Grocock were to be paid in CyberKey shares, he would receive those at a 20 percent discount to the average market price over the prior five trading days.  The agreement also provided Grocock the opportunity to buy "options" in CyberKey stock for 50 percent of the stock's market value.  Grocock was entitled to purchase these "options" in increments of $10,000 each month.

18.     Though Jim Plant made some overtures to Grocock about having CyberKey pay for Grocock's legal services in cash, his company did so rarely, if at all. Generally, CyberKey paid Grocock only in stock, which was held in escrow and transferred to the corporate brokerage accounts of J. Bennett Grocock, P.A. with WestPark Capital, account numbers 76271778 and 31551970.

19.     In order to turn these shares into cash, Grocock formally authorized his administrative assistant, Nancy Munro, to make trades, on his behalf, in his corporate brokerage accounts.

20.     Between February and May of 2006, Grocock sold shares worth over $78,000 that he had received from CyberKey as compensation for his legal services.

21.     The CyberKey shares Grocock received for his compensation were not issued pursuant to any registration statement.

22.     At some point in May or June of 2006, Grocock told Big Apple, which at the time was acting as CyberKey's securities distribution agent, that CyberKey was not paying his legal bills. For the next several months, Big Apple arranged to pay Grocock directly. Big Apple paid at least $60,000 of CyberKey's legal fees by selling CyberKey shares and sending checks to Grocock. None of those shares were issued pursuant to any registration statement or exemption from registration.

### Three Investigations into CyberKey and Grocock's Subsequent Sales of CyberKey Securities

23.     On December 8, 2005, CyberKey issued a press release announcing that: "the Company [had] received a multi-million Dollar purchase order from the Department of Homeland Security. The initial purchase order is in excess of 150,000 units."

24.    In the months following CyberKey's December 8, 2005 announcement, CyberKey issued numerous press releases claiming that the company had received a $25 million dollar purchase order from a Federal Government Agency.

25.    In the months after CyberKey began publicly claiming a $25 million contract with DHS, the Financial Industry Regulatory Authority ("FINRA") (formerly the National Association of Securities Dealers), the Utah Division of Securities, and the Commission initiated investigations into the company.

26.    On August 3, 2006, FINRA sent a request letter to Plant directing him to produce, among other things: any contracts between CyberKey and the Department of Homeland Security ("DHS"); contact information for CyberKey's contacts at DHS; documents related to CyberKey's accounts receivable; and any contracts between CyberKey and Big Apple Consulting.  One week later Plant forwarded a copy of the FINRA letter to Grocock.

27.    The FINRA staff had some difficulty in obtaining documents responsive to its request from Grocock's law firm.  Despite assurances from Grocock's law firm that documents would be forthcoming, and despite follow-up calls from the FINRA staff, Grocock's law firm never provided those documents to the FINRA.  The FINRA investigation into CyberKey was never publicly disclosed.

28.    On September 13, 2006, the Utah Division of Securities sent a letter to CyberKey asking a number of detailed questions about CyberKey's status as a publicly traded company.  The letter noted that if CyberKey did not provide the requested information in 30 days, the Division might pursue an administrative action against the company.  Grocock's law firm responded to this inquiry on CyberKey's behalf.

29.     On October 31, 2006, after becoming aware of two non-public investigations into CyberKey, one by FINRA and one from the Utah authorities, Grocock directed Munro to sell one million shares of unregistered CyberKey stock at prices ranging between $.024 and $.0295 per share.  These sales generated $25,355.

30.     On November 10, 2006, Grocock's law firm sent a partial response to the Utah Division of Securities.  On November 13, 2006, a Utah investigator spoke to an attorney at Grocock's law firm and informed him that the November 10, 2006 partial response did "not go to the heart of the Division's concerns," and explained the potential actions that the state of Utah could take if CyberKey did not provide adequate answers to its questions.  Despite this warning, Grocock's law firm did nothing to augment CyberKey's response for almost a month.

31.     In early November 2006, the Commission's staff began an informal inquiry into CyberKey by calling Plant.  Plant referred the staff to Grocock, and on November 15, 2006, the Commission sent a voluntary request letter to Grocock's attention via facsimile.  That letter requested, among other things, all documents related to CyberKey's press releases or other public announcements referring to DHS, and all documents, including contracts, agreements, understandings, or letters of intent evidencing the relationship, if any, between CyberKey and DHS.

32.     Between November 20 and November 30, 2006, after he became aware of the Commission's inquiry, Grocock directed Munro to sell another two million unregistered CyberKey shares at prices ranging between $.025 and $.0375 per share.  These sales generated $63,055.

33.     On November 30, 2006, Grocock responded to the Commission's staff on

CyberKey's behalf with an email attaching three single-page documents purporting to verify CyberKey's claims of a $25 million purchase order from DHS. The documents, however, were not from DHS, but instead consisted of two invoices purportedly issued by CyberKey and a purchase order from an entity called Leading Points Consulting LLC ("Leading Points").

34.     Grocock's November 30 email to the Commission read, in part:

> Attached is best available version of the P.O. submitted to Cyberkey last December by Leading Points. . . . Leading Points is a supplier to governmental agencies. Cyberkey is one of the vendors it contracted with to fulfill its contracts with the government [sic]. As you can see, this P.O. to Cyberkey is for over $24 million in USB storage devices and has been designated for shipping to field offices of DHS when they have been determined. Also attached are copies of two invoices totaling approximately $9 million for shipment under the P.O. in March and September of 2006. Both invoices have been paid by Leading Points.

35.     At the time Grocock sent the November 30, 2006 email, the Leading Points website contained a spare collection of information suggesting that Leading Points was in no position to provide products to DHS or anyone else.

36.     On December 4, 2006, Munro, at Grocock's direction, sold another 300,000 unregistered CyberKey shares at prices ranging between $.032 and $.0335 per share. These sales generated $9,850.

37.     On December 5, 2006, the Commission's staff spoke with Grocock by telephone, in order to elicit a more complete response to its request letter,. The staff asked Grocock to provide, among other things, a contact at DHS who could confirm CyberKey's $25 million claims. Grocock never provided a DHS contact in response to this request.

38.     On the same day of the December 5, 2006 conversation with the

Commission's staff, Munro, at Grocock's direction, sold another 350,000 unregistered CyberKey shares at prices ranging between $.03 and $.031 per share. These sales generated $10,700.

39.    On December 6, 2006, the Commission's staff sent a follow-up letter via facsimile, to Grocock, again urging a more complete response to its voluntary request letter.

40.    Grocock failed to respond to the December 6, 2006 letter. Instead, on December 6, 2006, Munro, at Grocock's direction, sold another 350,000 unregistered CyberKey shares at prices ranging between $.028 and $.0295 per share. These sales generated $9,975.

41.    On December 12, 2006, the Grocock law firm sent a longer response to the Utah Division of Securities letter of September 13, 2006.

42.    Meanwhile, Grocock continued to ignore the requests of the Commission's staff for a more complete response to its November 15, 2006 voluntary request letter. Specifically, despite a telephone call on December 13, 2006, and a letter on December 19, 2006, from the Commission's staff, Grocock did not provide any additional documents responsive to the November 15, 2006 request.

43.    On December 20, 2006, Grocock did send an email to the Commission's staff that read:

> I have been waiting expectantly for a box of materials from my client. They have been awaiting one final piece of paper that will confirm receipt of goods delivered to the customer/reseller (the vendor to DHS) along with confirmation of payment, just in case you don't believe the information in the P.O. and invoices I sent you previously. I hope to get those items any day now and to prepare a

detailed response to the Commission's informal inquiry.

44.     In fact, after December 20, 2006, Grocock did not provide the
Commission's staff any more documents responsive to the Commission's voluntary
request letter.

45.     On December 21, 2006, Grocock sent a terse letter to a Utah regulator
claiming that because of the regulator's "persistent and sometimes harassing and
threatening phone calls," CyberKey was moving its offices to Nevada.  In that letter,
Grocock claimed that because of CyberKey's move, which was to happen "immediately,"
CyberKey was no longer under any obligation to respond to Utah's requests for
information.  CyberKey never moved its offices to Nevada, and Grocock never informed
the Utah Division of Securities that CyberKey's offices were still in Utah.  The Utah
investigation into CyberKey was never publicly disclosed.

46.     On January 3 and 4, 2007, the Commission's staff called Grocock and left
voicemail messages seeking to confirm his promises of a more complete response to the
original voluntary request letter.  Grocock did not respond to either message.

47.     Between January 4 and 5, 2007, Munro, at Grocock's direction, sold
another 669,100 unregistered CyberKey shares at prices ranging between $.016 and $.017
per share.  These sales generated $10,914.

48.     On January 9, 2007, the Commission's staff called Grocock and left
another voicemail message, to which he did not respond.  On January 10, 2007, the
Commission's staff sent a letter via facsimile to Grocock's office detailing the recent
history of its communications with him and promising to seek subpoena authority if he
did not send responsive documents by January 15, 2007.

49.     Between January 29 and 30, 2007, Munro, at Grocock's direction, sold another 500,000 unregistered CyberKey shares at prices ranging between $.016 and $.0215 per share.  These sales generated $9,155 for Grocock.

50.     Having received no further response from Grocock, and having determined that the marketplace held insufficient information regarding CyberKey, on February 5, 2007, the Commission suspended trading in CyberKey's shares.  On that same day, the Commission's staff sent a subpoena for CyberKey documents to Grocock's attention and on February 7, 2007, sent Grocock a subpoena for Plant's testimony.

51.     On February 9, 2007, in response to the February 5, 2007 subpoena, Grocock submitted a number of documents on behalf of CyberKey.  The documents included bank statements and wire transfer records related to CyberKey's corporate bank account at SunFirst Bank in St. George, Utah.  The bank statements and wire records purported to show that approximately $25 million had been transferred into CyberKey's account from a company called "Kikomac".

52.     After receipt of the documents from Grocock, the Commission's staff obtained CyberKey's actual bank records and wire records directly from SunFirst Bank.  These documents did not reflect any transfers of money from a company called Kikomac to CyberKey and revealed that the bank statements and wire statements submitted by Grocock on behalf of CyberKey were fabricated.  The Commission's staff also determined that Kikomac did not exist.

53.     Between February 21 and 23, 2007, Munro, at Grocock's direction, sold 983,200 CyberKey shares at $.01 per share.  These sales generated $9,832.

### Jim Plant's Testimony before the SEC Staff

54.     On March 7, 2007, Plant provided sworn testimony to the Commission's staff in Washington, D.C. Grocock attended Plant's testimony as counsel for CyberKey. Near the end of Plant's testimony, the Commission's staff confronted Plant, for the first time, with the actual bank records produced by SunFirst. Plant could not explain why these records did not reflect the large transfers of money from Kikomac reflected in the bank statements he had previously produced to the Commission.

55.     Grocock flew back to Orlando on the evening of March 7, 2007, landing at Orlando International Airport at about 1 a.m. on March 8, 2007.

56.     On the morning of March 8, 2007, the Commission's staff spoke to Grocock on the telephone and explained that it was clear that CyberKey had no business relationship with DHS and had very little legitimate revenue at all. Grocock said he would explain the concerns of the Commission's staff's to Plant. In a second telephone call on March 8, Grocock relayed an explanation provided by Plant that the inconsistency in the bank statements resulted from the actions of an administrative assistant at CyberKey named Ruth Lane. According to Grocock, Plant was an unwitting "victim."

### Sales of CyberKey Stock After Plant's Testimony

57.     On March 8, 2007, the morning after Jim Plant's testimony, Munro, at Grocock's direction, sent an email to Grocock's broker at WestPark Capital that read, "Please sell 2,100,000 shares of [CyberKey] from account 76271778." In response to this order, Grocock's broker sold 1,580,000 unregistered shares on March 8 at prices ranging between $.005 and $.006 per share, for a total of $7,930.

58.     Concerned that Plant might flee, on March 13, 2007, the Assistant U.S. Attorney in charge of the parallel criminal investigation into CyberKey had Plant arrested in Utah.  At this point, CyberKey had made no public announcement regarding either (1) the false claims of the $25 million DHS purchase order or (2) Plant's arrest on charges of criminal securities fraud.

59.     On the day of Plant's arrest, Munro, at Grocock's direction, sent another email to Grocock's broker at WestPark Capital.  This one read, "Please start selling all of the CKYS you can from acct # 76271778 and then from acct # 31551970."  Pursuant to Munro's direction, between March 13, 2007 and March 15, 2007, Grocock's broker sold approximately 7,489,516 unregistered shares of CyberKey stock at prices ranging from $.005 to $.01 per share, for a total amount of approximately $13,687.

60.     On March 15, 2007, CyberKey issued a press release announcing "improper accounting methods and reporting procedures" and blaming the problems on CyberKey's "comptroller," Ruth Lane.  On the same day, Munro, at Grocock's direction, sent a third email to Grocock's broker that read, "You can stop selling the CKYS now."

61.     On March 19, 2007, Grocock's broker sold, on Grocock's behalf, approximately 1,345,240 shares of CyberKey stock at prices ranging from $.002 to $.005 per share.

62.     The table below details the sales of CyberKey stock Grocock directed

Munro to make from the corporate brokerage accounts of J. Bennett Grocock, P.A.

throughout the period of his engagement as counsel for CyberKey:

| MONTH | # SHARES SOLD | PROCEEDS | MONTH | # SHARES SOLD | PROCEEDS |
|---|---|---|---|---|---|
| Nov. 2005 | | $0 | Aug. 2006 | | $0 |
| Dec. 2005 | | $0 | Sept. 2006 | | $0 |
| Jan 2006 | | $0 | Oct. 2006 | 1,000,000 | $25,355 |
| Feb. 2006 | 2,956,352 | $42,747 | Nov. 2006 | 2,000,000 | $63,055 |
| Mar. 2006 | 943,396 | $11,271 | Dec. 2006 | 1,000,000 | $30,525 |
| Apr. 2006 | 793,655 | $14,315 | Jan. 2007 | 1,1169,100 | $20,069 |
| May 2006 | 785,000 | $9,740 | Feb. 2007 | 983,200 | $9,832 |
| June 2006 | | $0 | Mar. 2007 | 10,414,756 | $21,889 |
| July 2006 | | $0 | | | |

None of the shares of CyberKey stock Grocock sold during the period from February 1,

2006 through March 31, 2007, were issued pursuant to a registration statement.

63.     As a result of the transactions in CyberKey securities described above,

Grocock realized illegal profits of approximately $248,000.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]

64.     Paragraphs 1 through 63 are re-alleged and incorporated herein by

reference.

65.     As a result of his legal representation of CyberKey, Grocock owed a

fiduciary duty of trust and confidence to his client CyberKey and its shareholders, which

prohibited him from, among other things, using or disclosing material, nonpublic

information learned during the scope of his engagement as CyberKey's counsel.

66.     As described in paragraphs 23-53, Grocock knew or was reckless in not knowing that he sold CyberKey stock while in possession of confidential, material, nonpublic information concerning the investigations into CyberKey and that his trading of CyberKey stock was in breach of fiduciary duties or similar duties or similar duties of trust and confidence to CyberKey and its shareholders.

67.     As described in paragraphs 54-60, Grocock knew or was reckless in not knowing that he sold CyberKey stock while in possession of confidential, material, nonpublic information that he learned during Plant's investigative testimony before the Commission's staff on March 7, 2007, concerning the fact CyberKey did not have a contract with DHS and CyberKey had little or no actual revenue, and that his trading of CyberKey stock was in breach of fiduciary duties or similar duties of trust and confidence to CyberKey and its shareholders.

68.     By reason of the conduct alleged in paragraphs 23-60, Grocock, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or course of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

69.     By the conduct described above, Grocock violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

70.     Paragraphs 1 through 69 are re-alleged and incorporated herein by reference.

71.     As a result of his legal representation of CyberKey, Grocock owed a fiduciary duty of trust and confidence to his client CyberKey and its shareholders, which prohibited him from, among other things, using or disclosing material, nonpublic information learned during the scope of his employment.

72.     As described in paragraphs 23-53, Grocock knew or was reckless in not knowing that he sold CyberKey stock while in possession of confidential, material, nonpublic information concerning the investigations into CyberKey and that his trading of CyberKey stock was in breach of fiduciary duties or similar duties of trust and confidence to CyberKey and its shareholders.

73.     As described in paragraphs 54-60, Grocock knew or was reckless in not knowing that he sold CyberKey stock while in possession of confidential, material, nonpublic information that he learned during Plant's investigative testimony before the Commission's staff on March 7, 2007, concerning the fact CyberKey did not have a contract with DHS and CyberKey had little or no actual revenue, and that his trading of CyberKey stock was in breach of fiduciary duties or similar duties of trust and confidence to CyberKey and its shareholders.

74.     By reason of the conduct alleged in paragraphs 23-60, Grocock, in the offer or sale of securities, by the use of means or instrumentalities of interstate commerce

- 16 -

or of the mails, or of any facility of any national securities exchange, directly or

indirectly (a) employed devices, schemes, or artifices to defraud; (b) obtained money or

property by means of untrue statements of a material fact or omitted to state material

facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; or (c) engaged in acts, practices, or course of

business which operates or would operate as a fraud or deceit upon the purchaser.

75.     By the conduct described above, Grocock violated Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Violations of Sections 5(a) and 5(c) of the Securities Act
[15 U.S.C. § 77e(a) and 77e(c)]**

76.     Paragraphs 1 through 75 are re-alleged and incorporated herein by

reference.

77.     As described in paragraphs 18-22, 29, 32, 36, 38, 40, 47, 49, 53, 57, 59

and 61-62 Grocock, directly or indirectly, made use of the means or instruments of

transportation or communication in interstate commerce, or of the mails, to offer and sell

securities through the use or medium of a prospectus or otherwise when no registration

statement was in effect as to the security, or carried or caused to be carried through the

mails or in interstate commerce such security for the purpose of sale or for delivery after

sale. .

78.     By the conduct described above, Grocock has violated Sections 5(a) and

5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

- 17 -

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

(A)     Enter judgment in favor of the Commission finding that Grocock violated the registration and antifraud provisions of the federal securities laws as alleged herein;

(B)     Permanently enjoin Grocock from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder;

(C)     Order Grocock to disgorge all ill-gotten gains, including prejudgment interest thereon, resulting from the illegal trading alleged herein;

(D)     Order Grocock to pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

(E)     Grant such other relief as this Court deems just and proper.

Dated:  October 28, 2009

Respectfully submitted,

Of Counsel:
Cheryl J. Scarboro
John Reed Stark
Thomas A. Sporkin
David R. Herman
David Smyth

Jeffrey T. Infelise
Assistant Chief Litigation Counsel
D.C. Bar No. 456998
Tel: (202) 551-4904
Fax: (202)772-9362
E-mail: infelisej@sec.gov
*Lead and Trial Counsel*

Attorneys for Plaintiff
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-4010